UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

A.N., A MINOR, BY AND THROUGH     )
HER NEXT FRIEND, J.N.,            )
                                  )
          Plaintiffs,             )
                                  )
v.                                )     No. 1:24-cv-00239-CMS
                                  )
JACKSON R-II SCHOOL DISTRICT,     )
et al.,                           )
                                  )
          Defendants.             )

## OPINION, MEMORANDUM, AND ORDER

This matter is before the Court on Defendants Jackson R-II School District, Bryan Austin, and Scott Smith's Motion for Summary Judgment (Doc. 41) and Plaintiffs A.N. and Jamie Nipper's Motion for Partial Summary Judgment (Doc. 45). For the reasons stated herein, the Court **GRANTS IN PART** Defendants' Motion for Summary Judgment, **DENIES** Plaintiffs' Motion for Summary Judgment, and **REMANDS** this case to the Circuit Court of Cape Girardeau County.

## FACTUAL AND PROCEDURAL HISTORY

### The Allegations in Plaintiffs' Second Amended Complaint

According to Plaintiffs' Second Amended Complaint, in September 2024, A.N., a student at Jackson R-II Schools, grew worried about threats of violence to the schools and community. (Doc. 19). Plaintiffs allege that, on the evening of September 12, 2024, A.N. saw a Snapchat user post the following message: "Pray tm I'm bout to shoot up the Jackson school." (Doc. 19 at 7). A.N. messaged S.C., a boy who attended a nearby school district, "Was the school shooting thing real?" (Doc. 19 at 8). S.C. responded, "Yeah it's all around cape" and sent A.N. screenshots of the threats others had made. (Doc. 19 at 8). A.N. replied, "There's been threats in Jackson now" and

1

"Theres also been shootings in my neiborhood." (Doc. 19 at 9).  According to the Second Amended Complaint, S.C. asked A.N. to send him screenshots of the alleged threats A.N. had seen. (Doc. 19 at 9). A.N. stated that she had not taken a screenshot of the Snap but could recreate it for S.C. (Doc. 19 at 9).

A.N. then took a photo of her ceiling fan and captioned the photo, "Pray tm I'm bout to shoot up the Jackson school." (Doc. 19 at 10). Plaintiffs allege that S.C. took a screenshot of the Snap and asked A.N. who posted the original Snap. (Doc. 19 at 10). A.N. replied, "Idk it said unknown." (Doc. 19 at 10). S.C. shared the Snap with others but did not communicate that A.N. was recreating a Snap she had seen. (Doc. 19 at 10).

Jackson School District staff were made aware of the Snap on the evening of September 12, 2024. (Doc. 19 at 11). The next morning, the Jackson Police Department told District staff that they were investigating the Snap and could not guarantee the safety of students. (Doc. 19 at 11). The District promptly cancelled school and all school-related activities. (Doc. 19 at 12).

The Jackson Police Department asked to speak with A.N. on September 13, 2024. (Doc. 19 at 12). Plaintiffs claim that A.N. and her mother, Jamie Nipper, confirmed to a detective that A.N. had sent the Snap to S.C., but explained that A.N. was recreating a different Snap she had seen. (Doc. 19 at 12). According to the Second Amended Complaint, the detective concluded that "A.N. had not intended to cause any harm, panic, or disruption by sending the Snap, that there was no evidence suggesting that the Snap constituted a threat to any person or place, including the District, and that A.N. had neither the means nor the capability to act on any alleged" threat. (Doc. 19 at 12).

Two days later, Jackson R-II Superintendent Scott Smith asked Jamie Nipper if she could meet and discuss the Snap. (Doc. 19 at 15). Superintendent Smith informed Mrs. Nipper that school

2

had been cancelled on September 13, 2024, because of A.N.'s Snap. (Doc. 19 at 15). According to Plaintiffs, the purpose of this meeting, Superintendent Smith said, would be to give A.N. an opportunity to "tell her side of the story." (Doc. 19 at 15).  Mrs. Nipper and A.N. met with Superintendent Smith and Principal Bryan Austin the following day. (Doc. 19 at 15).

At the September 16 meeting, A.N. said that she had been nervous about public safety issues in her community. (Doc. 19 at 15). Plaintiffs allege that A.N. reached out to S.C. to express those concerns and to discuss the concerning Snap she then recreated. (Doc. 19 at 15).

Later that afternoon, Principal Austin suspended A.N. for ten days for violating the "Disruptive Conduct/Speech and/or False Alarm" policy from the Student Handbook. (Doc. 19 at 16). Principal Austin reasoned that the Snap had been "shared repeatedly throughout the community" and had forced the School District to cancel school and all related activities that day. (Doc. 19 at 16). In other words, Plaintiffs allege, Principal Austin suspended A.N. for the "disruption" the Snap had caused. (Doc. 19 at 16).

Principal Austin referred the matter to Superintendent Smith to determine if an extended suspension was necessary. (Doc. 19 at 17). Superintendent Smith extended A.N.'s suspension for an additional 170 days, again citing the School Handbook's "Disruptive Conduct or Speech, False Alarms, and or Threats" policies. (Doc. 19 at 17). Superintendent Smith explained the reasoning behind his decision in a letter to A.N. and her family. (Doc. 19 at 18).

A.N.'s family appealed her suspension to the Jackson R-II School Board. (Doc. 19 at 19). Superintendent Smith and Principal Austin both testified at the November 12, 2024, hearing. (Doc. 19 at 19). On November 15, 2024, the School Board's attorney emailed A.N.'s attorney that the School Board had voted to uphold A.N.'s extended suspension. (Doc. 19 at 19).

3

The Second Amended Complaint (Doc. 19) brings seven counts: a 42 U.S.C. § 1983 First Amendment claim against Defendants Austin and Smith (Count I); a Section 1983 First and Fourteenth Amendment "void for vagueness" claim as to the Off-Campus Behavior Policy against all Defendants (Count II); a Section 1983 Fourteenth Amendment Procedural Due Process claim against Defendants Austin and Smith (Count III); a Section 1983 *Monell* claim for a First Amendment violation against the School District (Count IV); a Freedom of Speech claim pursuant to Article I, § 8 of the Missouri Constitution against all Defendants (Count V); and a request for judicial review of the School Board's decision pursuant to RSMo § 167.161 (Count VI).[1]

**Plaintiffs and Defendants' Motions for Summary Judgment**

Defendants move for summary judgment on all counts. Along with their Motion for Summary Judgment, Defendants filed a Memorandum of Law and a Statement of Material Facts. (Doc. 41). Plaintiffs filed a Response to Defendants' Statement of Material Facts (Doc. 49).

Plaintiffs also move for partial summary judgment on Count III. (Doc. 45). Plaintiffs assert that Defendants violated several due process protections that are not tied to anything in the Second Amended Complaint. "It is improper for a plaintiff to raise new claims at summary judgment that have not been alleged within its complaint." *MWG Enterprises, LLC v. ETS Wound Care, LLC*, 586 F.Supp.3d 946, 960 (E.D. Mo. 2022). "Although the pleading requirements under Rule 8(a) are relatively permissive, the essential function of notice pleading is to give the defendant fair notice of what the claim is and the grounds upon which it rests." *WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co.*, 897 F.3d 987, 992-93 (8th Cir. 2018) (quoting *Bell Atl. Corp. v.*

---

[1] Count VII asked this Court to review whether the School District and Superintendent Smith violated RSMo 167.171.2(4) in refusing to stay A.N.'s suspension until the School Board had ruled on A.N.'s suspension. (Doc. 19 at 41). Plaintiffs voluntarily dismissed this count at the summary judgment stage. (Doc. 48 at 10).

*Twombly*, 550 U.S. 544, 555, (2007)) (citation modified). "Where discovery unveils new facts that support an alternative basis for relief, the claimant should seek to amend its operative pleading to include the additional factual allegations." *MWG Enterprises*, 586 F.Supp.3d at 960 (citing Fed. R. Civ. P. 15(a)).

Plaintiffs' Second Amended Complaint raises four discrete due process claims related to A.N.'s suspension. Plaintiffs' first ground is that Defendants should have given A.N. "timely notice that she was accused of violating the Disruptive Speech Policy or the False Alarms or Reports Policy." (Doc. 19 at 30). And as A.N. was suspended for more than ten days, the Complaint claims that Defendants were also required: "(1) to presume [A.N.'s] innocence, (2) to present evidence sufficient to show that she had engaged in conduct prohibited under the terms of one of those policies, and (3) to limit the punishments imposed for any proven violations to the penalties described in the Handbook." (Doc. 19 at 30).

In their Motion for Partial Summary Judgment, however, Plaintiffs claims evolve into six different requirements. (Doc. 45 at 2). Plaintiffs argue that due process required Defendants to provide A.N. with: (1) a minimal presumption of innocence; (2) clear, written notice of the specific policies the student is accused of violating and the penalties that might result if the alleged violation is proven; (3) a reasonable amount of time to prepare a defense against the accusations; (4) a neutral decisionmaker to oversee the process; (5) notice of any witnesses or evidence the decisionmaker might rely upon in determining the student's guilt or the severity of the punishment; and (6) the opportunity to cross-examine witnesses whose statements the decisionmaker might rely upon to determine guilt. (Doc. 45 at 2). Grounds 1 and 2 of Plaintiff's Motion for Partial Summary Judgment can fairly be traced back to the operative Complaint. Grounds 3 through 6, on the other hand, are completely novel due process claims. The Court exercises its discretion and declines to

5

consider these new theories at this late stage of the litigation. *MWG Enterprises*, 586 F.Supp.3d at 961; *Graber, Inc. v. W&Z Contracting Construction, LLC*, 2022 WL 873349 (E.D. Mo. Mar. 24, 2022).

*The Uncontroverted Material Facts*[2]

During the 2024-2025 school year, A.N. was a 12-year-old student in the Jackson R-II School District, a public school district in Missouri. (Doc. 41-1 at 1). During that school year, the School District's Student Handbook contained an Off-Campus Behavior Policy that stated: "the District may use its authority to address behavior that occurs off campus if it interferes with the operation of the school or endangers the safety of students or staff." (Doc. 41-1 at 3).

The Handbook contained a False Alarms or Reports Policy, which prohibited "intentionally tampering with alarm equipment for the purpose of setting off an alarm" or "making false reports for the purpose of scaring or disrupting the school environment." (Doc. 41-1 at 3). The Handbook listed the following potential penalties for a first-time violation of the False Alarms or Reports Policy: restitution, a principal/student conference, detention, in-school suspension, one to 180 days out-of-school suspension, or expulsion. (Doc. 41-1 at 3).

The Handbook also laid out the School's Disrespectful or Disruptive Conduct or Speech Policy. (Doc. 41-1 at 4). This provision applied to "conduct that interferes with an orderly education process such as disobedience or defiance to an adult's direction, use of vulgar or offensive language or graphics, [and] any rude language or gesture directed towards another person." (Doc. 41-1 at 4). The penalties for a first-time offense included a principal/student

---

[2] The section below sets out only the uncontroverted facts that may "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

6

conference, detention, in-school suspension, or one to ten days out-of-school suspension. (Doc. 41-1 at 4).

In the week before September 12, 2024, there were many social media posts about school shootings and threats across the country – likely in response to a school shooting in Georgia. (Doc. 41-1 at 1). A.N. felt fearful of going to school because of these threats, which included threats against neighboring school districts. (Doc 41-1 at 1).

On September 12, 2024, A.N. created a Snap that read, "Pray tm I'm about to shoot up the Jackson School." (Doc. 41-1 at 1-2). A.N. sent this Snap to S.C., a student at a neighboring school district. (Doc. 41-1 at 2). A.N. understood when she created the Snap and sent it to S.C. that S.C. may share the Snap with others. (Doc. 41-1 at 2). Within an hour, School District administrators learned about the Snap. (Doc. 41-1 at 2).

School District administrators cancelled all classes on September 13, 2024, in response to the Snap. (Doc. 41-1 at 2). In addition, the School District rescheduled a home varsity football game and cancelled a boys' swim meet, a JV boys' soccer game, football, cheerleading, and cross country practices, and a youth football tournament. (Doc. 41-1 at 2-3).

On September 16, 2024, A.N. and her mother, Jamie Nipper, attended a meeting with Superintendent Smith, Principal Austin, and others to discuss the Snap. (Doc. 41-1 at 4). A.N. was accompanied by two attorneys. (Doc. 41-1 at 4). At the meeting, A.N. was given notice of the allegations against her and an opportunity to explain her version of events. (Doc. 41-1 at 4). A.N. claimed that she had been nervous about threats of violence due to the September 11, 2024, email the District sent and the warning about someone in her neighborhood threatening to shoot people. (Doc. 50-1 at 13). She said that she saw what she thought might be an online threat toward "the Jackson school," so she sent S.C. a direct message on Snap to ask if that threat was real. (Doc. 50-

1 at 13). A.N. provided District officials with screenshots of her messages with S.C. and said that she had created the Snap at S.C.'s request. (Doc. 50-1 at 13). She also told the officials that the Snap was a re-creation of the threat she had seen and had told S.C. that as well. (Doc. 50-1 at 14).

A.N. was informed that she may have violated both the Disruptive Conduct or Speech Policy and the False Alarms or Reports Policy. (Doc. 41-1 at 4). After this meeting, Principal Austin suspended A.N. for ten days for violating both policies. (Doc. 41-1 at 5).

On September 24, 2024, Superintendent Smith imposed an additional 170-day suspension on A.N. (Doc. 41-1 at 4). In a letter addressed to A.N. and her family, Superintendent Smith cited A.N.'s violation of the False Alarms or Reports Policy and the Disruptive Conduct or Speech Policy. (Doc. 41-1 at 5). The letter informed A.N. that she had the right to appeal her suspension to the Jackson R-II School Board. (Doc. 41-1 at 5).

A.N. appealed to the School Board. (Doc. 41-1 at 5). At the appeal hearing on November 12, 2024, A.N. and Jamie Nipper's attorney presented evidence, called witnesses, and cross-examined Superintendent Smith and Principal Austin. (Doc. 41-1 at 5). After the hearing, the School Board upheld A.N.'s suspension, finding that the Snap had "created a material and substantial disruption to the educational environment." (Doc. 41-1 at 6). A.N.'s permanent record states that she was disciplined for making a social media threat "of violence towards Jackson Schools." (Doc. 45-1 at 15).

## ANALYSIS

### Summary Judgment Standard

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). A party moving for

8

summary judgment bears the burden of demonstrating that no genuine issue exists as to any material fact. *Id.* at 323. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party can satisfy its burden in either of two ways: it can produce evidence negating an essential element of the nonmoving party's case, or it can show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (citing *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000)).

When the moving party meets this burden, "the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Liberty Lobby, Inc.*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The "party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256 (quoting Fed. R. Civ. P. 56(e)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

**Defendants Are Entitled to Summary Judgment on Counts I, II, III, IV, and V.**

1. **Defendants Austin and Smith did not violate A.N.'s First Amendment Rights (Count I). In the alternative, Defendants Austin and Smith are entitled to qualified immunity.**

    a. *Defendants Austin and Smith did not violate A.N.'s First Amendment Rights.*

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. Amdt. 1)). And students "do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate.'"

*Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 594 U.S. 180, 187 (2021) (quoting *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969)). But given the "special characteristics of the school environment," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (citation omitted), "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 340–42 (1985)).

Over time, the Supreme Court has identified four specific categories of "student speech that schools may regulate in certain circumstances:"  (1) "indecent," "lewd," or "vulgar" speech uttered during a school assembly on school grounds; (2) speech, uttered during a class trip, that promotes illegal drug use; (3) speech that others may reasonably perceive as "bearing the imprimatur" of the school; and (4) speech that "materially disrupts classwork or involves substantial disorder or invasion of the right of others." *Mahanoy Area School Dist.*, 594 U.S. at 187-88 (citation modified).

In some circumstances, a school may also regulate speech that occurs off campus. And even though the *Mahanoy* court declined to create "a broad, highly general First Amendment rule" for determining when "off-campus" speech occurs and how schools may regulate that speech, the Court identified three important features to consider. *Id.* at 188-89. First, regulation and punishment of off-campus speech typically "falls within the zone of parental, rather than school-related, responsibility." *Id.* at 189. Second, regulating off-campus speech may require monitoring "all the speech a student utters during the full 24-hour day." *Id.* So "[w]hen it comes to political or religious speech" that occurs off-campus, "the school will have a heavy burden to justify intervention." *Id.* at 190. Finally, schools must make sure to protect "a student's unpopular expression, especially when the expression takes place off campus." *Id.*

10

With these principles in mind, the Court turns to the case at hand. The *Mahanoy* factors do not neatly apply when threats of school violence are involved. Even though regulation of off-campus speech typically "falls within the zone of parental" authority, speech that threatens violence against a school community threatens the safety of the school environment. And that justifies intervention by school officials. *Compare Mahanoy*, 594 U.S. at 191 (refusing to allow school to discipline student for using "vulgar" language that did not "identify the school in her posts or target any member of the school community"). Further, given the potential consequences of failing to swiftly act on threats of school violence, school officials will routinely meet their "heavy burden" of justifying intervention. That principle applies even when the speech may be protected by the First Amendment for an adult. *See generally Watts v. United States*, 394 U.S. 705, 706 (1969) (overturning conviction for statement, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.").

Even before *Mahanoy*, the Eighth Circuit extended *Tinker*'s substantial disruption analysis to "off-campus student speech where it is reasonably foreseeable that the speech will reach the school community and cause a substantial disruption to the educational setting." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 777 (8th Cir. 2012) (citing *D.J.M. v. Hannibal Public Sch. Dist. # 60*, 647 F.3d 754, 766 (8th Cir. 2011)).[3]

---

[3] One court has summarized the Eighth Circuit's precedent on off-campus speech as follows: "school districts may punish [off-campus] speech which *either* caused a substantial disruption *or* where it was reasonably foreseeable that such speech would reach the school community and cause a substantial disruption." *McKinney as Next Friend of K.P. v. Huntsville Sch. Dist.*, 350 F.Supp.3d 757, 766 (W.D. Ark. 2018) (emphasis added). In this Court's view, Eighth Circuit precedent requires reasonable foreseeability that the speech will reach campus. *See D.J.M. ex rel. D.M.*, 647 F.3d at 766 ("Here, it was reasonably foreseeable that D.J.M.'s threats about shooting specific students in school would be brought to the attention of school authorities and create a risk of substantial disruption within the school environment."); *S.J.W. ex rel. Wilson*, 696 F.3d at 778 ("[W]e expect *Tinker* will apply here because the Wilsons' speech was, in the District Court's words, 'targeted at' Lee's Summit North."); *see also id.* ("Just like the online speech in *Kowalski*

First, that A.N.'s speech (the Snap) would reach the school community was reasonably foreseeable. A.N. shared the Snap on Snapchat, a social media platform that allows users to easily screenshot sent messages. A.N. knew of the risk that the recipient of the Snap could screenshot the Snap and share it with others. (Doc. 41-1 at 2). The Snap also specifically identified a Jackson school as the target of the school shooting. (Doc. 41-1 at 1-2). Further, A.N. sent the Snap in the wake of several threatened school shootings and an actual school shooting in Georgia. (Doc. 41-1 at 1). This context clearly increases the likelihood that the Snap would be brought to the attention of school authorities. *See A.S. by and through Schaefer v. Lincoln County R-III Sch. Dist.*, 429 F.Supp.3d 659, 670 (E.D. Mo. 2019) ("The timing of A.S.'s speech is significant, too, given that he created and circulated the meme and encouraged its dissemination the same day as homecoming – a highly social and school-centric event involving several high school students and an increased level of communication among students."). In light of these factors, that the Snap would reach the school community was reasonably foreseeable.

That the Snap would cause a substantial disruption in the school community was also reasonably foreseeable. "The test is an objective one, focusing on the reasonableness of the school administration's response, not on the intent of the student." *Id.* (citing *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 113 (2d Cir. 2012)); *see also Tinker*, 393 U.S. at 514 ("[T]he record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities[.]"). The Snap could reasonably be construed as threatening a school shooting at a Jackson school. "[S]chool violence is an unfortunate reality that educators must confront on an all too frequent basis," *Lavine v. Blaine*

---

and *Doninger*, the NorthPress posts 'could reasonably be expected to reach the school or impact the environment.'") (quoting *Kowalski v. Berkeley County Sch.*, 652 F.3d 565, 573 (4th Cir. 2011)).

*Sch. Dist.*, 257 F.3d 981, 987 (9th Cir. 2001), and "threats of an attack on a school and its students must be taken seriously." *Ponce v. Socorro Independent Sch. Dist.*, 508 F.3d 765, 771 (5th Cir. 2007) (emphasis omitted). Threats of a school shooting—regardless whether they are meant as a joke, as a serious threat, or as a "re-creation" of another student's threat —almost always result in extensive safety precautions and school disruptions. *See, e.g.*, *D.J.M. ex rel. D.M.*, 647 F.3d at 766 (detailing concerns about student safety and increased security measures after a school shooting threat); *Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 40 (2d Cir. 2007) (expressing "no doubt" that an icon depicting a teacher being shot "would foreseeably create a risk of substantial disruption within the school environment").

Finally, the uncontroverted material facts establish that the Snap created a substantial disruption to A.N.'s school community. The Snap resulted in the cancellation of classes on September 13, 2024. (Doc. 41-1 at 2). Many extracurricular events, such as athletic games and practices, were either postponed or cancelled. (Doc. 41-1 at 2). School cancellation necessarily entails a substantial disruption of the school environment. *See A.N. By and Through Niziolek v. Upper Perkiomen Sch. Dist.*, 228 F.Supp.3d 391, 399 (E.D. Pa. 2017).

Defendants Austin and Smith did not violate A.N.'s First Amendment rights. The Snap caused a substantial disruption to the school environment and is therefore not protected by the First Amendment. Defendants Austin and Smith are entitled to summary judgment on Count I.

### b. *Defendants Austin and Smith are entitled to qualified immunity on Count I.*

Defendants Austin and Smith did not violate A.N.'s First Amendment rights. But even if they did, Defendants Austin and Smith would be entitled to qualified immunity. "Qualified immunity is 'an immunity from suit rather than a mere defense to liability[.]'" *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "An

13

[official] is entitled to qualified immunity unless: '(1) he violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable [official] would know of the right at the time of the alleged violation.'" *Klum v. City of Davenport*, 145 F.4th 907, 912 (8th Cir. 2025) (quoting *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 982 (8th Cir. 2019)).

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78–79, (2017) (per curiam) (internal quotation marks omitted). "Because the focus is on whether the [official] had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). Although there does not need to be a case "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U.S. at 79 (alterations omitted). Officials are entitled to qualified immunity unless they could have read "the relevant precedent beforehand and 'known' that it proscribed their specific conduct." *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (quoting *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015)) (citation modified).

True, the "law is clearly established that students have First Amendment rights both on and off the school campus." *A.S. by and through Schaefer v. Lincoln County R-III Sch. Dist.*, 429 F.Supp.3d 659, 676 (E.D. Mo. 2019). But "[r]eciting an abstract right at a high level of generality" is not sufficient to defeat qualified immunity. *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008 (8th Cir. 2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)). The "clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019). The Eighth Circuit has noted that *Tinker* held that "speech which actually caused a

14

substantial disruption to the educational environment is not protected by the First Amendment." *S.J.W. ex rel. Wilson*, 696 F.3d at 778. So, if anything, the law is clearly established that students do not have a First Amendment right to engage in speech that causes a substantial disruption to the school environment.

The answer does not change because A.N.'s speech took place off campus. In *Mahanoy*, the Supreme Court applied *Tinker*'s substantial disruption framework and found "no evidence in the record" of any "substantial disruption." 594 U.S. at 192. That analysis suggests that *Tinker* applies to at least some off-campus speech. Similarly, Eighth Circuit cases before *Mahanoy* applied *Tinker* to off-campus speech. *D.J.M. ex rel. D.M.*, 647 F.3d at 765; *S.J.W. ex rel. Wilson*, 696 F.3d at 777. The same can be said for court of appeals decisions in other circuits. *See Wisniewski*, 494 F.3d at 38 ("With respect to school officials' authority to discipline a student's expression reasonably understood as urging violent conduct, we think the appropriate First Amendment standard is the one set forth by the Supreme Court in *Tinker*[.]"); *Kowalski v. Berkeley County Sch.*, 652 F.3d 565, 573 (4th Cir. 2011) (concluding that "the school was authorized to discipline Kowalski because her speech interfered with the work and discipline of the school," even though the speech occurred off campus.). In sum, the law is not clearly established that a school administrator may not discipline a student for off-campus speech that results in a substantial disruption to the school environment.

Plaintiffs also argue that the law is clearly established that a school official may not discipline a student for making a true threat without regard to the student's *mens rea*. (Doc. 48 at 21) (citing *Counterman v. Colorado*, 600 U.S. 66 (2023)). But this is not a "true threat" case. Given the "special characteristics of the school environment," *Tinker*, 393 U.S. at 506, a school may regulate speech that does not rise to the level of a "true threat." *Leroy v. Livingston Manor*

15

*Central Sch. Dist.*, 158 F.4th 414, 423 (2d Cir. 2025). This Court is unable to locate a single case predating September 2024—let alone a "robust consensus of cases of persuasive authority," *Lane v. Nading*, 927 F.3d 1018, 1022 (8th Cir. 2019) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018))—applying *Counterman*'s recklessness requirement to off-campus student speech.

Defendants Austin and Smith therefore are entitled to summary judgment on Count I on the additional basis of qualified immunity.

### 2. The Off-Campus Behavior Policy is not unconstitutionally vague (Count II).

In Count II, Plaintiffs bring both a facial and an as-applied challenge to the Off-Campus Behavior Policy.  "The void-for-vagueness doctrine is embodied in the due process clauses of the fifth and fourteenth amendments." *Stephenson v. Davenport Community Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (quoting *D.C. and M.S. v. City of St. Louis, Mo.*, 795 F.2d 652, 653 (8th Cir. 1986). A governmental policy is unconstitutionally vague if it fails to "provide adequate notice of the proscribed conduct" and lends "itself to arbitrary enforcement." *Parents Defending Education v. Linn Mar Community Sch. Dist.*, 83 F.4th 658, 668 (8th Cir. 2023) (quoting *United States v. Barraza*, 576 F.3d 798, 806 (8th Cir. 2009)). "Flexibility and reasonable breadth are acceptable as long as it is clear what the rule as a whole prohibits." *Iowa Safe Schs. v. Reynolds*, 172 F.4th 589, 596 (8th Cir. 2026) (quoting *Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 356 (8th Cir. 2020)).

"The degree of vagueness tolerated by the Constitution depends on the nature of the enactment as well as potential penalties." *Id.* (citing *Rowles*, 983 F.3d at 356). "If the enactment does not impose criminal penalties, due process requires less specificity—and even less specificity is required for public school disciplinary rules." *Id.* (citing *Rowles*, 983 F.3d at 356); *see also Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972) (noting that "a statute written specifically

16

for the school context" is subject to lesser scrutiny than a general "breach of the peace" ordinance). But when "the First Amendment is implicated," "the vagueness doctrine demands a proportionately greater degree of specificity when the law reaches the exercise of free speech" – even in the public school context. *Id.* (quoting *Parents Defending Educ.*, 83 F.4th at 668).

Here, the Off-Campus Behavior Policy states, "the District may use its authority to address behavior that occurs off campus if it interferes with the operation of the school or endangers the safety of students or staff." (Doc. 41-1). In determining whether an ordinance or rule is vague, courts look to the "common usage" of the rule's language, "judicial explanations of its meaning," and "previous applications of the [rule] to the same or similar conduct." *Stephenson*, 110 F.3d at 1309 (quoting *D.C. and M.S.*, 795 F.2d at 654). Here, both the common usage of the phrase "interferes with the operation of the school" and judicial decisions interpreting this phrase come from the same place: *Tinker.*

In *Tinker*, the Supreme Court held that a student was constitutionally permitted to speak on "controversial subjects" "if he does so without 'materially and substantially interfer[ing]with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others.'" 393 U.S. 503 at 513 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966). The *Tinker* Court noted that school officials could not "forbid[] discussion of the Vietnam conflict… if it could not be justified by a showing that the students' activities would materially and substantially disrupt the work and discipline of the school." *Id.*

Since *Tinker* was published in 1969, it has been cited in nearly 3,000 judicial opinions – including 50 times by the Eighth Circuit alone. As Defendants note, these terms have an "established meaning in school discipline." (Doc. 41-2 at 20). And in a void-for-vagueness challenge to a similar regulation, another district court in this circuit found that the plaintiffs did

17

not even have a "fair chance" of showing that the regulations were void-for-vagueness at the preliminary injunction stage. *See McKinney as Next Friend of K.P. v. Huntsville Sch. Dist.*, 350 F.Supp.3d 757, 769 (W.D. Ark. 2018) (finding the school regulations "gave notice that discipline could be imposed for activities occurring off-campus which would have a negative impact on school discipline, the educational environment, or the welfare of students or staff.").

The meaning of the phrase, "endangers the safety," is also discernible. "Endanger" means to "bring into danger or peril of probable harm or loss: imperil or threaten danger to." Endanger, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 748 (2002). And the applicable definition of safety is "the condition of being safe: freedom from exposure to danger: exemption from hurt, injury, or loss[.]" *Id.* at 1998. Read together, this phrase applies when a student engages in behavior that threatens physical harm to staff and students – as in A.N.'s case. In short, the Off-Campus Behavior Policy gives adequate notice to students what conduct is prohibited.

The Off-Campus Behavior Policy is also not subject to arbitrary enforcement simply because it uses the word "may." "Flexibility… [is] acceptable as long as it is clear what the rule as a whole prohibits." *Iowa Safe Schs.*, 172 F.4th at 596 (quoting *Rowles*, 983 F.3d at 356). The purpose of the arbitrary-enforcement prong is to ensure lawmakers "establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). "Enforcement of student conduct policies requires some degree of judgment." *Rowles*, 983 F.3d at 357.

Here, the phrases "interferes with the operation of the school" and "endangers the safety of students or staff" bind the school administrator's discretion to the impact on the school environment. That limitation "place[s] meaningful bounds on the enforcement decisions of school

18

administrators." *Woodis v. Westark Comm. Coll.*, 160 F.3d 435, 440 (8th Cir. 1998). The Off-Campus Behavior Policy thus is not unconstitutionally vague as applied to A.N.

That finding is also fatal to Plaintiffs' facial challenge to the Off-Campus Behavior Policy. In opposing Defendants' Motion for Summary Judgment, Plaintiffs point to the statements of the Principal and Superintendent that "there may be circumstances in which that [policy] results in discipline against students even when those students did not reasonably know that their off-campus behavior would interfere with the operation of the school or endanger the safety of students or staff." (Doc. 48 at 28). But a "plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). As discussed before, A.N. should have reasonably known that the Snap could reach campus and interfere with the operation of the school. (Doc. 41-1 at 2). Because the Off-Campus Behavior Policy "clearly proscribed" A.N.'s own conduct, she does not have standing to bring a facial challenge.

Defendants are entitled to summary judgment on Count II.

**3. Defendants are entitled to summary judgment on Count III. Plaintiffs' Motion for Partial Summary Judgment is therefore denied.**

Both parties move for summary judgment on Count III. And both parties agree that *Goss v. Lopez*, 419 U.S. 565, 574 (1975), guides this Court's analysis. "A student's legitimate entitlement to a public education is a property interest protected by the Due Process Clause." *Plaintiff A v. Park Hill Sch. Dist.*, 97 F.4th 586, 590 (8th Cir. 2024) (quoting *Goss*, 419 at 574) (citation modified). When a student is facing a suspension of ten days or less, the student must be given notice and an opportunity to be heard. *Id.* (citing *Goss*, 419 U.S. at 581). In those circumstances, the student must "be given oral or written notice of the charges against him and, if

19

he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss*, 419 U.S. at 581. In *dicta*, the Supreme Court noted that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id.* at 584.

The Supreme Court has never expanded on that *dicta*. *Plaintiff A*, 97 F.4th at 590. So courts "have applied the balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine what additional process may be due." *Doe ex rel. Doe v. Todd Cnty. Sch. Dist.*, 625 F.3d 459, 462–63 (8th Cir. 2010). Under *Mathews*, courts weigh three factors to determine the required procedural protections: "(1) the private interest affected by the official action; (2) 'the risk of an erroneous deprivation of such interest through the procedures used' and the probable value of additional procedure safeguards; and (3) the government's interest, 'including the fiscal or administrative burdens' of additional procedures." *Plaintiff A*, 97 F.4th at 590 (quoting *Mathews*, 424 U.S. at 321).

> #### a. Defendants are entitled to summary judgment on Count III because they did not violate A.N.'s Due Process Rights.

Defendants' Motion for Summary Judgment addresses three of Plaintiffs' Procedural Due Process grounds found in the Second Amended Complaint. Each argument will be addressed in turn.

> #### i. The Uncontroverted Material Facts establish that A.N. was given adequate notice of the charge and the right to respond at the initial meeting.

Defendants first argue that they complied with the minimal protections of *Goss* at the initial meeting. The Court agrees. At a minimum, *Goss* requires that a student "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581. The

uncontroverted material facts establish that A.N. was given notice of the allegations against her and an opportunity to explain her version of events. (Doc. 41-1 at 4). A.N. was told that she may have violated both the Disruptive Conduct or Speech Policy and the False Alarms or Reports Policy. (Doc. 41-1 at 4). Further, A.N. explained to school officials at the initial meeting that she had been nervous about threats of violence due to the September 11, 2024, email the School District sent and the threats in the neighborhood. (Doc. 45-1 at 9). A.N. provided the school officials with the Snap, her text conversation with S.C., and explained that the Snap was a re-creation of a threat another student had made. (Doc. 45-1 at 9).

Plaintiffs nonetheless argue that Defendants failed to comply with *Goss*' minimal procedures because Defendants did not notify Plaintiffs of the charges before the meeting and did not identify the witnesses against A.N. These arguments are directly foreclosed by *Goss* itself.

As *Goss* stated, "[t]here need be no delay between the time 'notice' is given and the time of the hearing." 419 U.S. at 582. Therefore, there is no constitutional requirement that a student or parent be given notice of the charges before the hearing. Further, *Goss* did not state that identifying witnesses at the initial meeting was a "rudimentary precaution," as Plaintiffs claim. *Goss* requires "an explanation of the evidence the authorities have," but does not require a school disciplinarian to divulge the identity of any witnesses. *See also Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 924 (6th Cir. 1988) (concluding that there is no due process right to learn the identity of student witnesses even at a formal hearing).

### ii. Plaintiffs abandoned their argument that A.N. had a constitutional right to the presumption of innocence.

Second, Defendants argue that A.N. had no constitutional right to the presumption of innocence in this setting. As discussed below, Plaintiffs reshape their "presumption of innocence" argument into a "some evidence" argument. "In our adversary system… we rely on the parties to

21

frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *see also Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment) ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." ). The Court will not craft an argument for Plaintiffs opposing Defendants' Motion for Summary Judgment on this ground.[4] Because the "failure to oppose a basis for summary judgment constitutes waiver of that argument," *Satcher v. Univ. of Ark. At Pine Bluff Bd. Of Trustees*, 558 F.3d 731, 735 (8th Cir. 2000), this argument is waived.

Even if Plaintiffs had not abandoned their presumption of innocence argument, the individual Defendants would still be entitled to qualified immunity. Even though *In re Winship* described the presumption of innocence as the "bedrock" of due process, that case involved the sufficiency of evidence in juvenile proceedings. 397 U.S. at 363. Again, "[r]eciting an abstract right at a high level of generality" is not sufficient to defeat qualified immunity. *Ehlers v. City of Rapid City*, 846 F.3d at 1008 (citing *Anderson*, 483 U.S. at 639-40). And the Eighth Circuit has cautioned "that it is not sound to draw any analogy between student discipline and criminal procedure[.]" *Woodis*, 160 F.3d 435, 440 (8th Cir. 1998) (quoting *Jones v. Snead*, 431 F.2d 1115, 1117 (8th Cir. 1970)). The law simply is not clearly established that students have the right to the presumption of innocence in school disciplinary proceedings. The individual Defendants therefore are not liable for monetary damages on this ground.

---

[4] Plaintiffs' stray reference to *In re Winship*, 397 U.S. 358 (1970) is not enough to contest Defendant's argument on this ground. "Failure to brief an issue in more than a 'perfunctory manner,' allows a court to consider the issue waived." *Clay v. Credit Bureau Enterprises, Inc.*, 882 F.Supp.2d 1083 (N.D. Iowa 2012) (quoting *Ramirez v. Debs–Elias*, 407 F.3d 444, 447 n.3 (1st Cir. 2005)).

### iii. Plaintiffs abandoned their argument that A.N.'s conduct was not clearly proscribed by Student Handbook Policy S-170P.

Finally, Defendants Austin and Smith argue that A.N.'s conduct was clearly proscribed by Policy S-170P. (Doc. 41-2 at 29). Plaintiffs do not respond to this argument, and instead focus on the purported lack of notice given to them. (Doc. 48 at 2)("The record thus reveals that Defendants imposed a long-term suspension on A.N. based on a charge and evidence that Defendants had not made her aware of, and which she had no opportunity to dispute prior to the imposition of the punishment."). Because Plaintiffs do not respond to Defendants' specific argument on this point, the issue is waived.

#### b. Plaintiffs are not entitled to summary judgment on Count III because Defendants Austin and Smith did not violate A.N.'s due process rights.

##### i. The Uncontroverted Material Facts establish that Defendants Austin and Smith had "some evidence" to justify the suspension of A.N.

The Due Process Clause of the Fourteenth Amendment required Defendants Austin and Smith to possess "some evidence" to justify suspending A.N. "In a variety of contexts, the [Supreme] Court has recognized that a governmental decision resulting in the loss of an important liberty interest violates due process if the decision is not supported by any evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985) (prison discipline); *see also Douglas v. Buder*, 412 U.S. 430, 432, (1973) (per curiam) (revocation of probation); *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239 (1957) (denial of admission to bar); *United States ex rel. Vajtauer v. Commissioner of Immigration*, 273 U.S. 103, 106 (1927) (deportation).

The *Mathews* balancing test also supports this conclusion. That test balances: "(1) the private interest affected by the official action; (2) 'the risk of an erroneous deprivation of such interest through the procedures used' and the probable value of additional procedure safeguards;

23

and (3) the government's interest, 'including the fiscal or administrative burdens' of additional procedures." *Plaintiff A*, 97 F.4th at 590 (quoting *Mathews*, 424 U.S. at 321).

The first prong is well-established: Missouri students have a property right in a public education. *State ex rel. Yarber v. McHenry*, 915 S.W.2d 325, 328 (Mo. 1995) (en banc). And the "arbitrary denial of [a] plaintiffs' right to education is forbidden under the Due Process Clause." *Strickland v. Inlow*, 519 F.2d 744, 747 (8th Cir. 1975). Second, if there is truly *no* evidence supporting the school administrator's decision, then there is necessarily an "erroneous deprivation" of that property interest. *Mathews*, 424 U.S. at 321. Third, requiring school administrators to have "some evidence" before disciplining a student imposes little to no additional burden on the administrators. Before suspending a student, school administrators are already required to give students "an explanation of the evidence the authorities have[.]" *Goss*, 419 U.S. at 581. School administrators, therefore, are already required to have "some evidence" under *Goss*' minimal due process protections.

That said, the Court has no problem concluding that the uncontroverted material facts establish that Defendants Austin and Smith had "some evidence" to support A.N.'s suspension. The "some evidence" standard is not a high bar for administrators to meet. Their decision will be upheld if "'there was some evidence from which the conclusion of the [decision-maker] could be deduced....'" *Hill*, 472 U.S. at 455 (quoting *United States ex rel. Vajtauer*, 273 U.S., at 106). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the" decision-maker. *Id.*

24

A.N. was suspended for violating the False Alarms or Reports Policy, which prohibited "making false reports for the purpose of scaring or disrupting the school environment." (Doc. 41-1 at 3). A.N. admitted to District officials that she created the Snap and sent it to S.C. (Doc. 50-1 at 13). A.N. was also aware that the Snap could be shared with other people once she sent it to S.C. (Doc. 41-1 at 2).

Here, Defendants Austin and Smith did not have to credit A.N.'s claims that she merely recreated the Snap to send to S.C.  Defendant Smith noted that A.N. had sent the Snap to somebody she had just met and that A.N. admitted she had not seen any other threats. (Doc. 50-1 at 21). The school administrators could infer—based on the content of the Snap itself, A.N.'s awareness of ongoing threats of school shootings, and A.N.'s failure to bring those alleged threats to the attention of an adult—that A.N. acted with the purpose of "scaring or disrupting the school environment." This evidence was sufficient to meet the "meager" standard of "some evidence" as a matter of law. *Hill*, 472 U.S. at 457.

Because Defendants Austin and Smith did not violate A.N.'s due process rights on this ground, the Court need not address Defendants Austin and Smith's argument that they are entitled to qualified immunity.

### ii.   The Uncontroverted Material Facts establish that A.N. had adequate notice of the charges and evidence against her.

*1.   A.N. had adequate notice of the charges against her.*

Plaintiffs first argue that Defendants Austin and Smith were "never clear about what policies A.N. was accused of violating." (Doc. 45-5 at 8). But *Goss* does not require that a school administrator identify the specific school policies that a student has allegedly violated before imposing a suspension. *See Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062, 1072 (9th Cir. 2013) (holding that a student received adequate due process when he was not informed of the

"'specific rules, policies, or procedures that [were] alleged to have been violated'"). The dispute over whether A.N. received notice during the initial meeting of the specific policies she violated is therefore immaterial. (Doc. 50-1 at 24-25). In any event, any alleged lack of notice at the initial hearing did not substantially prejudice Plaintiffs. The uncontroverted material facts establish that A.N. and her family received notice of the specific policies A.N. was alleged to have violated in a letter mailed the day of the initial meeting. (Doc. 50-1 at 17-18). *Sykes v. Sweeney*, 638 F.Supp. 274, 278 (E.D. Mo. 1986).

Plaintiffs also briefly take issue with the fact that A.N. was alleged to have violated both the Disruptive Conduct/Speech and the False Alarms or Reports Policies. (Doc. 45-5 at 8). Plaintiffs do not cite any authority for their position that a school administrator must choose one of several potential school policy violations on which to proceed. And Plaintiffs do not explain how punishing a student pursuant to two policies, even when the student is given notice that she has violated both policies, violates due process. Plaintiffs are not entitled to summary judgment on this ground.

### 2. Plaintiffs never pleaded that Defendant Smith failed to disclose all evidence that he relied on in deciding to suspend A.N.

Plaintiffs also argue that Defendant Smith violated A.N.'s due process rights by failing to disclose all information upon which he relied before extending A.N.'s suspension. In their Statement of Uncontroverted Material Facts, Plaintiffs point out that Defendant Smith "gather[ed] more information" before deciding to suspend A.N. for an additional 170 days. (Doc. 50-1 at 18). At his deposition, Defendant Smith testified that Officer Lester informed him that A.N. had admitted to Officer Lester that, contrary to what Plaintiffs now allege in their Second Amended Complaint, she had not seen any threats towards Jackson R-II Schools before creating the Snap. (Doc. 50-2 at 16). Defendant Smith's conversation with Officer Lester occurred after A.N.'s initial

meeting with school administrators. (Doc. 50-2 at 5-6). Defendant Smith did not disclose this fact to A.N. or her parents, but he admitted that it played a part in his decision to suspend A.N. under the False Alarms or Reports Policy. (Doc. 50-1 at 21).

Much like Plaintiffs' other arguments on Count III, this theory is not mentioned in the Second Amended Complaint. In the operative Complaint, Plaintiffs first claim that Defendants should have given A.N. "timely notice that she was accused of violating the Disruptive Speech Policy or the False Alarms or Reports Policy." (Doc. 19 at 30). In addition, because A.N. was suspended for more than ten days, the Complaint claims that Defendants were also required: "(1) to presume [A.N.'s] innocence, (2) to present evidence sufficient to show that she had engaged in conduct prohibited under the terms of one of those policies, and (3) to limit the punishments imposed for any proven violations to the penalties described in the Handbook." (Doc. 19 at 30). Plaintiffs also generally allege that "Defendants acted under the color of state law when they suspended A.N., first for ten days and then for an additional 170 days without clearly identifying the factual basis upon which A.N. was deemed to have violated the False Alarms or Report Policy, which only authorizes punishment of 'false reports [made] for the purpose of scaring or disrupting the school environment.'" (Doc. 19 at 31) (emphasis omitted).

Later in the Complaint, Plaintiffs shed further light on this argument when they argue that qualified immunity does not apply. "At the time the Defendants suspended A.N." for the Snap, Plaintiffs note, "a reasonable official would have understood that where the False Alarm and Report Policy only proscribes 'intentionally tampering with alarm equipment for the purpose of setting off a false alarm, [or] making false reports for the purpose of scaring or disrupting the school environment,' the Due Process Clause would not permit Defendants to punish A.N. for a

27

communication that Defendants had no basis for believing was either 'false' or 'made for the purpose of scaring or disrupting the school environment.'" (Doc. 19 at 33) (emphasis omitted).

When read in light of Plaintiffs' four broad pleaded theories, Plaintiffs' "factual basis" claim basically tracks her theory that Defendants were required "to present evidence sufficient to show" that she had violated school policies. And that goes to her argument that Defendants were required to show "some evidence" before suspending Plaintiff, as shown in the allegation that qualified immunity does not apply.

Plaintiffs also never moved to amend their Complaint to include this theory based on information uncovered in discovery. "Where discovery unveils new facts that support an alternative basis for relief, the claimant should seek to amend its operative pleading to include the additional factual allegations." *MWG Enterprises*, 586 F.Supp.3d at 960 (citing Fed. R. Civ. P. 15(a)). At the latest, A.N. became aware that Defendant Smith spoke to Officer Lester about the Snap at Defendant Smith's October 16, 2025, deposition. But Plaintiffs never sought leave to include these new facts and related theories in any complaint.

In short, there is nothing in the Second Amended Complaint to put any defendant on notice that Plaintiffs' claims rest on an allegation that Defendant Smith withheld crucial information from Plaintiffs before suspending A.N. for 170 days. Therefore, any dispute over what information Defendant Smith did not disclose to Plaintiffs or what information he relied on in suspending A.N. for 170 days is immaterial. *See Anderson*, 477 U.S. at 248 (stating that only facts that may "affect the outcome of the suit" are material). Plaintiffs are not entitled to summary judgment on this ground.

> 3. *Any alleged failure to disclose information did not result in substantial prejudice to A.N.*

28

Even if the Court were to consider Plaintiffs' new argument that Defendant Smith withheld information from Plaintiffs, Plaintiffs have not shown how that substantially prejudiced A.N. Fundamentally, to establish a violation of procedural due process, a party must show substantial prejudice.[5] *Sykes*, 638 F.Supp at 279 (citing *Keough v. Tate Cnty. Bd. of Educ.*, 748 F.2d 1077, 1083 (5th Cir. 1984)). To be entitled to the expungement she seeks, A.N. must show that her suspension would not have been upheld had Defendant Smith disclosed his conversation with Officer Lester. *Achman v. Chisago Lakes Ind. Sch. Dist. No. 2144*, 45 F.Supp.2d 664 (D. Minn. 1999); *see also Hopkins v. Saunders*, 199 F.3d 968, 978 (8th Cir. 1999) ("[I]n the context of public employment, reinstatement is proper only where a tenured employee would not have been dismissed if his procedural due process rights had been observed.").

Here, the School Board ratified A.N.'s suspension without considering Officer Lester's statements to Defendant Smith. At the appeal hearing, Defendant Smith twice testified that he had no basis for disbelieving A.N.'s claim that she had seen another student post the Snap. (Doc. 45-1 at 14). And there is nothing in the record to suggest that Defendant Smith somehow informed the School Board of this fact behind closed doors. *Compare Newsome*, 842 F.2d at 927 (finding procedural due process violation when "the superintendent disclosed to the school board, during their closed deliberations, new evidence which had not been presented during the open hearing[.]"). In any event, contrary to Plaintiffs' burden to show that A.N.'s suspension would not have been upheld if Defendant Smith had disclosed his conversation with Officer Lester, disclosure of that conversation at the appeal hearing would only have further supported the School Board's ratification of A.N.'s suspension under the False Alarms or Reports Policy.

---

[5] In the absence of prejudice, a party may be entitled to nominal damages. *See Carey v. Piphus*, 435 U.S. 247, 266 (1979).

Additionally, the School Board's decision is supported on a separate ground: the Snap created a "material and substantial disruption" which was "prejudicial to good order and discipline" in the school. (Doc. 41-10 at 6). Under Missouri law, the power to suspend a student for conduct which is "prejudicial to good order and discipline" is vested solely in the school board. RSMo § 167.161(1) ("The school board of any district, after notice to parents or others having custodial care and a hearing upon charges preferred, may suspend or expel a pupil for conduct which is prejudicial to good order and discipline in the schools or which tends to impair the morale or good conduct of the pupils."). And for the reasons stated previously, the uncontroverted material facts establish that the Snap caused a "material and substantial disruption" to the school environment.

Thus, Plaintiffs cannot establish substantial prejudice, and A.N. is not entitled to expungement of her records on procedural due process grounds.

> 4.   *In the alternative, Defendants Austin and Smith are entitled to qualified immunity.*

Defendants Austin and Smith also are immune from monetary damages because of qualified immunity. As a preliminary matter, it is not clearly established that *Goss*' requirements apply to suspension extensions. *Goss* limited itself to initial suspensions lasting ten days or less. 419 U.S. at 584. The Eighth Circuit has not addressed this question. "[I]n in the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits and district courts." *K.W.P. v. Kansas City Pub. Schools*, 931 F.3d 813, 828 (8th Cir. 2019) (quoting *Tlamka v. Serrell*, 244 F.3d 628, 634 (8th Cir. 2001)).

Federal courts have not uniformly decided that *Goss* applies to suspension extensions of more than ten days. Early on, federal district courts held that *Goss* applied to each individual suspension. *See Montoya v. Sanger Unified Sch. Dist.*, 502 F.Supp. 209 (E.D. Cal. 1980); *Waln v.*

*Todd Cnty. Sch. Dist.*, <u>388 F.Supp.2d 994</u> (D.S.D. 2005); *C.T. v. Valley Stream Union Free Sch. Dist.*, <u>201 F.Supp.3d 307, 318</u> (E.D.N.Y. 2016); *Doe v. Todd Cnty. Sch. Dist.*, No. Civ. 05-3043, <u>2006 WL 3025855</u> (D.S.D. Oct. 20, 2006). But in 2022, the Tenth Circuit reasoned that a 21-day suspension extension was governed by the *Mathews* balancing test, not *Goss*. *C1.G on behalf of C.G. v. Siegfried*, <u>38 F.4th 1270, 1281</u> (10th Cir. 2022). Given the diverging views on whether *Goss* applies to suspension extensions, it is not "beyond debate" that *Goss* would apply to A.N.'s 170-day suspension extension. *Mullenix v. Luna*, <u>577 U.S. 7, 12</u> (2015) (quoting *Ashcroft v. al–Kidd*, <u>563 U.S. 731, 741</u> (2011).

Nor is it clearly established that a school administrator must divulge additional information he obtains after an initial meeting before imposing an additional suspension. Certainly, *K.J. by and through Johnson v. Jackson*, <u>127 F.4th 1239</u> (9th Cir. 2025), seems to imply so. But that decision relied on "broad general proposition[s]" from *Goss*. *See Rivas-Villegas v. Cortesluna*, <u>595 U.S. 1, 8</u> (2021) (quoting *Brosseau v. Haugen*, <u>543 U.S. 194, 198</u> (2004)) (stating that the clearly established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."). And while the Ninth Circuit in *K.J.* extended *Goss* "to suspension extensions based on new charges or new evidence," *Goss* itself and the Eighth Circuit are silent on that issue.

This issue is not "beyond debate," and Defendants Austin and Smith are entitled to qualified immunity.

### 4. Defendants are entitled to summary judgment on Count IV because there is no underlying First Amendment violation.

In Count IV, Plaintiffs allege that the School District, acting through Principal Austin and Superintendent Smith, violated A.N.'s First Amendment rights by applying an unconstitutional "zero-tolerance" policy towards "any communication that could be construed as a student threat

31

to engage in gun violence at school[.]" (Doc. 19 at 36). "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from an official municipal policy." *Corwin v. City of Independence, Mo.*, 829 F.3d 695, 699 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)) (citation modified). A policy is a "deliberate choice of a guiding principle or procedure made by the government official who has final authority regarding such matters." *Sorcan v. Rock Ridge Sch. Dist.*, 131 F.4th 646, 651 (8th Cir. 2025) (quoting *Corwin*, 829 F.3d at 700) (citation modified).

Plaintiffs' derivative *Monell* claim fails as a matter of law. In that context, the Eighth Circuit "has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." *Moore v. City of Desloge, Mo.*, 647 F.3d 841, 849 (8th Cir. 2011) (quoting *McCoy v. Monticello*, 411 F.3d 920, 922 (8th Cir. 2005)). Because Defendants Austin and Smith did not violate A.N.'s First Amendment constitutional rights and are entitled to judgment as a matter of law on Count I, the School District likewise is entitled to judgment on Count IV.

5. **Defendants are entitled to summary judgment on Count V because Mo. Const. art. I, § 8 is coextensive with the First Amendment.**

In Count V, Plaintiffs assert that Defendants also violated A.N.'s right to freedom of expression under Mo. Const. Art. I, § 8.[6] In relevant part, that provision states:

---

[6] Even though the Court has dismissed all of Plaintiffs' federal claims, this Court elects to exercise its discretion to address Count V. "In the 'usual case' where all federal claims are dismissed on a motion for summary judgment, 'the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Starkey v. Amber Enterprises, Inc.*, 987 F.3d 758, 765 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). But as described below, Missouri courts construe Mo. Const. art. I, § 8, in reference to the First Amendment. When a state law claim is "is so closely patterned after the federal" law claim that state courts "look to federal law" when deciding the state law claim, a federal court may exercise its discretion and decide the state law claim. *Id.* (citation omitted).

32

> That no law shall be passed impairing the freedom of speech, no matter by what means communicated: that every person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject, being responsible for all abuses of that liberty[.]

> Mo. Const. art. I, § 8.

According to Plaintiffs, the protections of this provision "are more extensive and more stringent than those provided under the First Amendment." (Doc. 19 at 37). The Supreme Court of Missouri has repeatedly declined to say so. *See State v. Roberts*, 779 S.W.2d 576, 579 (Mo. 1989) (en banc) ("We need not decide in this case whether the circumference of Mo. Const. art. I, § 8 is identical to that of the First Amendment in all instances."); *BBC Fireworks, Inc. v. State Highway and Transp. Com'n*, 828 S.W.2d 879, 881 (Mo. 1992) (en banc); *Kansas City Premier Apartments, Inc. v. Missouri Real Estate Com'n*, 344 S.W.3d 160, 170 (Mo. 2011) (en banc). Rather, that court has hinted that Mo. Const. Art. I, § 8 is likely coextensive with the First Amendment. *Karney v. Dep't of Labor and Industrial Relations*, 599 S.W.3d 157, 163 n.3 (Mo. 2020) (en banc) ("Though this Court *may* construe a corresponding state constitutional provisions to provide more expansive protections than its federal constitutional counterpart, this Court has consistently construed like provisions similarly.") (emphasis in original); *see also State v. Wooden*, 388 S.W.3d 522 (Mo. 2013) (en banc) (finding a statute constitutional under the First Amendment without separately analyzing whether the statute was constitutional under Mo. Const. art. I, § 8).

"Where the Supreme Court of Missouri has not spoken, we must predict how the court would rule, and we follow decisions from the intermediate state courts when they are the best evidence of Missouri law." *Rey v. Gen. Motors, LLC*, 76 F.4th 1125, 1131 (8th Cir. 2023) (quotation omitted). In this scenario, the Supreme Court of Missouri would likely rule that A.N.'s rights to free speech and expression were not violated. "[A]nalysis of a section of the federal constitution is strongly persuasive in construing the like section of" the Missouri Constitution.

33

*Karney*, 599 S.W.3d at 163 (quoting *Doe v. Phillips*, 194 S.W.3d 833, 841 (Mo. 2006) (en banc)). As the First Amendment and Mo. Const. art. I, § 8, are "comparable," *State v. Vaughn*, 366 S.W.3d 513, 517 n.3 (Mo. 2012) (en banc) (citing *Planned Parenthood of Kan. v. Nixon*, 220 S.W.3d 732, 736 (Mo. 2007) (en banc)), the Supreme Court of Missouri would likely apply the reasoning of *Tinker*, *Mahanoy*, and related school speech cases.

As this Court already has concluded in considering Count I, Defendants did not violate A.N.'s First Amendment rights. Defendants also did not violate A.N.'s rights under Mo. Const. art. I, § 8. Defendants are entitled to summary judgment on Count V.

### Count VI is Remanded to State Court.

In Count VI, Plaintiffs seek judicial review of the School Board's decision pursuant to a state statute, RSMo 167.161(4). This Court declines to exercise its jurisdiction over this distinctly state-law claim.

A district court "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. 1367(c)(3). The Court recognizes that both parties have spent considerable time and effort litigating this case in federal court. But reviewing the decision of a locally elected school board pursuant to a statute enacted by the Missouri General Assembly for that purpose would raise significant federalism concerns, which this Court will not ignore. "'It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.' Those judgments are best left to the voters who elect the school board." *Doe v. Pulaski Cnty. Special Sch. Dist.*, 306 F.3d 616, 627 (8th Cir. 2002) (quoting *Wood v. Strickland*, 420 U.S. 308, 326 (1975)). Given these concerns, the Court declines to exercise its

34

jurisdiction over this state-law claim. This count is remanded to the Circuit Court of Cape Girardeau County.

**CONCLUSION**

Defendants' Motion for Summary Judgment (<u>Doc. 41</u>) is **GRANTED** on Counts I, II, III, IV, and V of the Second Amended Complaint. Plaintiffs' Motion for Partial Summary Judgment on Count III is **DENIED**. Count VI is **REMANDED** to the Circuit Court of Cape Girardeau County. Count VII is **DISMISSED** without prejudice.

Dated this 22nd day of June, 2026.

 

_____

CRISTIAN M. STEVENS
UNITED STATES DISTRICT JUDGE